FILED BY _____ D.C.

05 AUG 30 AM 7:45

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

ANTHONY MURFF,

     Petitioner,

vs.                                          No. 05-2164-Ml/V

DAVID MILLS,

     Respondent.

ORDER VACATING MAY 11, 2005 ORDER
ORDER DENYING LEAVE TO PROCEED IN FORMA PAUPERIS
ORDER CORRECTING THE DOCKET
ORDER OF DISMISSAL
ORDER DENYING CERTIFICATE OF APPEALABILITY
AND
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH

Petitioner Anthony Murff, Tennessee Department of Correction prisoner number 331233, an inmate at the West Tennessee State Penitentiary ("WTSP") in Henning, Tennessee, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on March 1, 2005, along with an application seeking leave to proceed in forma pauperis. The Court issued an order on May 11, 2005 denying leave to proceed in forma pauperis and directing the petitioner to pay the habeas filing fee within thirty days. The Clerk docketed a letter from the petitioner on May 20, 2005 indicating, correctly, that he had paid the habeas filing fee on March 7, 2005.

Accordingly, the Court VACATES the May 11, 2005 order and DENIES the in forma pauperis motion as moot. The Clerk shall record the respondent as WTSP warden David Mills.[1]

I.   STATE COURT PROCEDURAL HISTORY

Following a jury trial in the Lauderdale County Circuit Court, Murff was convicted of especially aggravated robbery on February 23, 2001. He was sentenced on March 16, 2001 to sixty (60) years imprisonment to be served at 100% as a Range III offender. The Tennessee Court of Criminal Appeals affirmed. State v. Murff, No. W2000-01459-CCA-R3-CD, 2002 WL 1284296 (Tenn. Crim. App. June 11, 2002).

Murff filed a pro se petition pursuant to the then-current version of the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-201 to -222, in the Lauderdale County Circuit Court on September 20, 2002 in which he alleged that he received ineffective assistance of counsel. Counsel was appointed to represent Murff and the postconviction court conducted an evidentiary hearing on February 7, 2003. The postconviction court dismissed the petition on February 10, 2003, and the Tennessee Court of Criminal Appeals affirmed, Murff v. State, No. W2003-00467-CCA-R3-PC, 2004 WL 367668 (Tenn. Crim. App. Feb. 26, 2004), perm. app. denied (Tenn. June 14, 2004).

---

[1]     Although the petition lists Tennessee Attorney General Paul J. Summers as an additional respondent, the proper respondent to a habeas petition is the petitioner's custodian. See Rumsfeld v. Padilla, 124 S. Ct. 2711, 2718 (2004). The Clerk is ORDERED to remove Summers as a party to this action.

On August 11, 2004, Murff filed a petition for a writ of habeas corpus, pursuant to Tenn. Code Ann. § 29-21-101 et seq., in the Lauderdale County Circuit Court. The trial court summarily denied the petition on August 16, 2004, and the Tennessee Court of Criminal Appeals affirmed, Murff v. Mills, No. W2004-02210-CCA-R3-HC, 2005 WL 195097 (Tenn. Crim. App. Jan. 28, 2005), perm. app. denied (Tenn. May 23, 2005).

The Tennessee Court of Criminal Appeals summarized the facts underlying the criminal charge as follows:

> On May 27, 2000, the seventy-seven year old victim, Robert Milton Woodard, Sr., who was partially paralyzed from a stroke, was alone in his apartment in Ripley when the forty-one-year-old defendant, Anthony Murff, came to his door, ostensibly seeking payment for having mowed the victim's lawn. When the victim admitted the defendant into his home, the defendant struck him multiple times in the head with a hammer, bound his arms behind his back with an electrical cord, and took cash from his wallet. The defendant was subsequently indicted on one count of especially aggravated robbery and one count of aggravated assault.
>
> The defendant's trial was held February 22-23, 2001. The State's first witness was the elderly victim, who described having been attacked and robbed by the hammer-wielding defendant on the evening of May 27, 2000. The victim testified that he heard a knock at his front door at about 8:00 or 8:30 p.m., looked out his peephole, and recognized the man who had mowed his yard and whose mother lived in the next-door apartment. Opening his door, he said to the defendant, "I guess you're here after your money," and the defendant replied, "Yes." The victim testified that he thought he owed the defendant $5, and told him he would have to write a check because he did not have the exact change. When he turned around to get his checkbook, the defendant started hitting him in the back of the head with a hammer, demanding, "Where's your money and guns?" The victim said he told the defendant that thieves had taken his guns, and that

3

he did not have any money on him, except for a $10 bill in his wallet in his hip pocket. He said he told the defendant, "Just go ahead and take that," and he thought the defendant had done so.

The victim estimated that the defendant hit him twenty-five to thirty times with the hammer before shoving him onto the living room couch and tying his hands behind his back with an electrical cord he cut from a floor lamp. He said the defendant went to the back of the apartment, out of his line of vision, during part of the time that he was there. When he could no longer hear the defendant, the victim went to his bedroom and telephoned 911, having apparently somehow managed to free one arm. The police kicked his door open when they arrived, and he reacted by shooting a gun that he had hidden in his bedroom. The victim explained that it was dark, and he had mistaken the policeman who first entered his home for the defendant, "coming back" to "finish [him] off." He testified that he was taken first to the emergency room of the local hospital and then to the Regional Medical Center in Memphis ("The Med"), where surgeons implanted a steel plate in the top of his head.

The victim acknowledged on cross-examination that he had probably owed the defendant money for cutting his grass. However, he could not remember the defendant having told him he owed $10, and denied that there had been any dispute over how many times the defendant had cut the grass, or the amount he owed. He also denied that he had cursed or hit the defendant, or threatened to shoot or kill the defendant or his mother. The victim testified that all the drawers in his bedroom dresser were open, but as far as he could determine, the only thing taken from his apartment was the cash from his wallet. He said that he kept his loaded gun in his sock drawer, and his sock drawer was the only drawer he had opened. Although he acknowledged it was "possible" that the defendant had brought him a towel for his head wound, he had no memory of his having done so. He said that the defendant had not offered to call for help and had shoved, rather than assisted, him onto the couch. The victim denied that he had a problem with alcohol, or that he had been drinking on the day he was attacked.

On redirect, the victim testified that the defendant kept saying "over and over" during the attack that someone had told him that the victim had $15,000 in his

4

apartment. The victim testified, however, that the only money he had was $10 or $12 in his wallet, and that the defendant took the money only after "about beat[ing][his] head in" with the hammer.

Sergeant Charles L. "Buddy" Smith of the Ripley Police Department, who had known the victim for forty years, testified that he and fellow officers arrived at the victim's apartment at about 9:17 p.m. Unable to get a response at either the front or the rear door, he stood on tiptoes, shining his flashlight into the apartment through a small window at the top of the front door. When he saw dentures lying in a pool of what appeared to be blood near the front door, they kicked the front door open to gain forcible entry into the apartment. Smith testified that Officer Jamie Jarrett was the first to enter the apartment, and that he slipped in a pool of blood as he went through the door. At about the same time, two shots rang out, and Smith, who entered the apartment immediately behind Jarrett, saw the victim, dressed in a T-shirt and white boxer shorts, "slouching along"[2] the hallway from the back bedroom. Smith testified that he ducked behind the door and called the victim by name, telling him that it was the police, that it was "Buddy," and to put his gun down. The victim complied, stumbling forward into Smith's arms and allowing Smith to take his gun and place it on a living room chair out of his reach.

Smith testified that blood was "profusely coming" from the victim's head and face. One of his hands was free; the other was tied so tightly with an electrical cord that it was turning "purplishy-red." When he asked the victim who had attacked him, the victim told him, "My yard man did it." Smith identified a number of photographs of the crime scene, including ones that showed the victim's dentures lying in a pool of blood, blood-soaked cushions on the couch, the victim's wallet and keys lying on a televison tray in the living room, the electrical cord used to tie the victim's hands, the floor lamp from which the cord was cut, and the general disarray in the victim's bedroom. He testified that the dresser drawers in the victim's bedroom were pulled out, the closet door was open, the mattress was pushed

---

[2]     In a footnote, the state court observed that "Sergeant Smith indicated that the victim's slouching gait was the result of his earlier stroke." State v. Murff, 2002 WL 1284296, at *2 n.1.

off-center on the bed, and an open jewelry box was on the edge of the bed. According to Smith, the dresser drawers and the jewelry box had been "gone through." On cross-examination, he acknowledged that the clothes in the victim's dresser drawers appeared to be neatly folded and lying flat, and testified that he had not smelled any alcohol on the victim's breath.

Off-duty Ripley Police Officer Rich Mawyer, who was also a paramedic, heard the radioed calls for assistance and went to the victim's apartment to aid the emergency medical technicians who were assisting the victim. Mawyer testified that the victim had a serious head injury and had lost a "considerable amount of blood." Around the victim's right wrist, he found a lamp cord tied so tightly that the distal portions of the victim's arm had become badly swollen and discolored. Mawyer said that the victim was in severe pain and extremely upset. He testified that the victim told him that the man who cut his grass had knocked on his door, pushed his way into his apartment, and immediately started hitting him in the head with a hammer, which the victim assumed he had brought with him.

The defendant's mother, June Brewer, who lived next door to the victim, testified that the defendant came to her apartment at about 1:30 p.m. on May 27, 2000, bringing with him a bag of clothes because he planned to spend the night. She said that he left her apartment at about 5:30 or 6:00 p.m., dressed in white jogging pants and a white shirt with stripes, and that she did not see him again that day. On cross-examination, Ms. Brewer testified that the defendant had mowed the victim's yard twice, but the victim had not been home on several occasions when the defendant had attempted to collect payment. She testified on redirect that the defendant did not have any injury to his face when she saw him on May 27, 2000.

Steve Sanders, a criminal investigator with the Ripley Police Department, arrived at the victim's apartment at approximately 10:05 p.m. on May 27, 2000, after the arrival of Criminal Investigator Jeff Fayne and the securing of the crime scene. Sanders described the bloody condition of the victim's living room, and testified that the disarray in the victim's bedroom included a knocked-over lamp, a telephone on the floor, open dresser drawers in which the clothes appeared to

6

have been moved around, the mattress at an angle on the bed with the victim's watch lying on the exposed box springs, and an open jewelry box on the bed, in which the contents appeared to have been rearranged. He said that during their search of the surrounding area, Fayne discovered some clothing and a wooden-handled hammer in a plastic grocery bag inside a city garbage cart about 100 yards from the victim's apartment. Sanders identified a photograph of the grocery bag and its contents, testifying that the bag contained a pair of white jogging pants, a pair of white tennis shoes, a black sock, a white glove, and a wooden-handled hammer with a hole drilled in the handle. He said that there appeared to be blood on the shoes, on the pants, and on both the claw and head areas of the hammer.

Sanders and Fayne later questioned the defendant at city hall. After he had been advised of his <u>Miranda</u> rights and had signed a waiver of rights form, the defendant made a statement in which he admitted that he had hit the victim in the head with the hammer, tied him up with the electrical cord, and taken $10 from his wallet. However, as the following portion of the statement reveals, the defendant attempted to portray the victim as the aggressor in the encounter:

I Anthony Murff went to [the victim's] door and knocked and ask [sic] him could he pay me for cutting his yard. He said how much do I owe you? I told him that he owed me $10.00. He said how in hell do I owe you $10.00 and I said I cut your yard week before last and last week. He said your [sic] a lying mother fucker and slapped me. After he slapped me he started to turn around and said let me get my gun I'm going to kill your black ass. At that point I hit him in the head with the hammer. After I hit him we got into a wrestling match where he continued to tell me that he was going to kill [me]. [The victim] then fell into the floor and continued to say I'm going to kill you and your mother. I then told [the victim] that all I came over here for was the money that you owe me. I then helped [the victim] up off the floor and set [sic] him on the couch and told him that I was sorry. [The victim] said It don't [sic] matter I [sic] still going to kill your black ass. [The victim] kept trying to get up off the couch saying let me get my gun, thats [sic] when I tied him up with the

7

cord that I cut off of a lamp to keep him from getting the gun and killing me or my mother. Just before I tied him up I got $10.00 out of his wallet after he threw it at me.

The defendant also told the investigators that he had changed his clothes at his mother's apartment and placed a grocery bag, containing the hammer and the clothes he had worn during the attack, in a garbage can down the street from his mother's home.

Sanders testified that he had examined and copied the victim's medical records from Baptist Memorial Hospital-Lauderdale and The Med. These medical records were admitted into evidence by stipulation of the parties. Sanders testified that the victim's medical records revealed that he suffered multiple lacerations and injuries to his head, neck, and jaw during the attack, including "multiple complex lacerations observed to the head after it was shaved, depressed skull fracture which required that . . . a skull fracture plate be inserted in [the victim's] head, and . . . two other complex scalp lacerations on the right side of his head that had to be stapled together."

Sanders acknowledged on cross-examination that it was within "the realm of possibility" that the disarray he had observed in the victim's bedroom was caused by the victim, and that neither the victim nor his family had ever reported anything missing other than the cash taken from the victim's wallet. He said that Fayne had attempted to lift fingerprints from the victim's bedroom but had been unsuccessful. On redirect, he testified that he had not seen any sign of injury to the defendant when he interviewed him after the incident. . . .

Patrolman Kelly Schroburger of the Ripley Police Department testified that he located the defendant approximately four-tenths of a mile from the victim's apartment, between 10:00 and 11:00 p.m. on May 27, 2000, and took him to the police department. He said that the defendant was dressed in clean, neatly pressed dress pants, dress shirt, and clean dress shoes, and the defendant told him he had been at his mother's house.

Tennessee Highway Patrol Officer Jamie Jarrett, who had been an officer with the Ripley Police Department on May 27, 2000, testified that he was the first officer to

8

enter the victim's residence in response to his 911 call. As he entered the dark apartment, yelling "Police, police," he saw the victim standing in the hallway dressed in a "very bloody" white T-shirt and white underpants, and bleeding "real bad" from his head and face. He next saw the victim reach toward his bed, saw a flash, heard a "bang," and realized that the victim was shooting at him. Jarrett testified that he was not hurt and had no hard feelings against the victim for shooting at him. He knew the victim had been very frightened and understood the victim's reaction.

Lauderdale County Jail Administrator Timothy A. Bratton testified that the defendant's inmate medical history reflected that he did not exhibit any visible signs of illness or trauma, and he answered "[n]o" to whether he had suffered any recent head injury, when he was booked into the jail at 4:36 a.m. on May 28, 2000. Richard Rhodes, the officer who took the medical history, testified that he did not see any signs of injury to the defendant, and he remembered the defendant telling him that he did not have any head injury or illness to report.

Ripley Police Department Criminal Investigator Jeff Fayne described his investigation of the incident, and identified the items he found in the garbage cart. He testified that there were drops of blood on the hammer and "quite a bit of blood down around the legs" of the defendant's white jogging pants, as well as "some up around the mid-thigh area." He also found a drop of blood beside the door mat outside Ms. Brewer's door, as well as on the door itself. During his interview with Ms. Brewer, she "stated that her son had a hammer that had been at her apartment that had a hole drilled in the handle of it." The defendant, when questioned, told him that he had been driving a nail into his mother's wall in order to fix a place to tie his dog. However, Fayne saw no signs of any dog at or around Ms. Brewer's apartment, and found no evidence of where one could have been tied. He saw no evidence of any injury to the defendant when he took his statement.

Fayne testified that he took the victim's statement at the Intensive Care Unit of The Med on May 31, 2000. He identified photographs, which were subsequently admitted into evidence, showing the extent of the victim's injuries at that time. Fayne testified that most of the

9

victim's injuries occurred to the right side of the back
of his head and his right shoulder. However, in addition
to these "severe, severe injuries," the victim also had
an injury to his left jaw, a cut on his left leg above
his knee, and various bruising and cuts on his right
forearm and hand, which Fayne characterized as defensive
wounds.

The only witness to testify on the defendant's
behalf was the custodian of the medical records at the
Baptist Memorial Hospital-Lauderdale. Through her
testimony, the defendant's medical records were
introduced into evidence. These records indicate that the
defendant was admitted to the hospital on April 29, 2000,
approximately one month before the instant offense,
complaining of asthma, and was discharged on May 1, 2000,
with a "discharge diagnosis" that included "status post
contusion of left eye with possible mass or hematoma of
left maxillary sinus." The records further reflect that
a CT scan of the head was ordered during the defendant's
hospital stay "due to the recent history of trauma and to
the possible fracture of the inferior orbit," and that
the defendant underwent a surgical biopsy of the mass on
August 30, 2000.

State v. Murff, 2002 WL 1284296, at *1-*5 (alterations in original;

footnote omitted).

II.     PETITIONER'S FEDERAL HABEAS CLAIMS

In this federal habeas petition, Murff raises the

following issues:

1.   Whether the Tennessee Court of Criminal Appeals
     erred by denying the postconviction petition when
     the petitioner plainly alleged that he was denied
     his Sixth Amendment right to a fair and impartial
     jury by reason of the juror selection process
     employed at trial;

2.   Whether the Tennessee Court of Criminal Appeals
     erred by denying the postconviction petition when
     the petitioner plainly alleged that the State
     violated his Fourth Amendment rights by failing to
     promptly arraign him;

10

3.  Whether the Tennessee Court of Criminal Appeals erred by denying the postconviction petition when the petitioner clearly demonstrated that he received ineffective assistance of counsel, in violation of the Sixth Amendment;

4.  Whether the Tennessee Court of Criminal Appeals erred by denying the postconviction claim concerning his trial counsel's inadequate consultation, in violation of the Sixth Amendment; and

5.  Whether the Tennessee Court of Criminal Appeals erred by denying the postconviction claim concerning the failure of trial counsel to ensure that the jury instructions were proper.

III. <u>ANALYSIS</u>

A.  <u>Waiver and Procedural Default</u>

Twenty-eight U.S.C. § 2254(b) states, in pertinent part:

(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

(A)  the applicant has exhausted the remedies available in the courts of the State;  or

(B)  (i)  there is an absence of available State corrective process;  or

(ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.

(2)  An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

Thus, a habeas petitioner must first exhaust available state remedies before requesting relief under § 2254. <u>E.g.</u>, <u>Granberry v. Greer</u>, 481 U.S. 129, 133-34 (1987); <u>Rose v. Lundy</u>, 455 U.S. 509,

11

519 (1982); Rule 4, Rules Governing Section 2254 Cases in the United States District Courts ("Section 2254 Rules"). A petitioner has failed to exhaust his available state remedies if he has the opportunity to raise his claim by any available state procedure. 28 U.S.C. § 2254©; <u>Preiser v. Rodriguez</u>, 411 U.S. 475, 477, 489-90 (1973).

To exhaust his state remedies, the petitioner must have presented the very issue on which he seeks relief from the federal courts to the courts of the state that he claims is wrongfully confining him. <u>Picard v. Connor</u>, 404 U.S. 270, 275-76 (1971); <u>Rust v. Zent</u>, 17 F.3d 155, 160 (6th Cir. 1994). "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief." <u>Gray v. Netherland</u>, 518 U.S. 152, 162-63 (1996). "'[T]he substance of a federal habeas corpus claim must first be presented to the state courts.'" <u>Id.</u> at 163 (quoting <u>Picard</u>, 404 U.S. at 278). A habeas petitioner does not satisfy the exhaustion requirement of 28 U.S.C. § 2254(b) "by presenting the state courts only with the facts necessary to state a claim for relief." <u>Id.</u>

Conversely, "[i]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." <u>Id.</u> When a petitioner raises different factual issues under the same legal

theory he is required to present each factual claim to the highest state court in order to exhaust his state remedies. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987). He has not exhausted his state remedies if he has merely presented a particular legal theory to the courts without presenting each factual claim. Pillette, 824 F.2d at 497-98. The claims must be presented to the state courts as a matter of federal law. "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6 (1982); see also Duncan v. Henry, 513 U.S. 364, 366 (1995) (per curiam) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

Moreover, the state court decision must rest primarily on federal law. Coleman v. Thompson, 501 U.S. 722, 734-35 (1991). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the petitioner ordinarily is barred by this procedural default from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977). However, the state-court decision need not explicitly

address the federal claims; instead, it is enough that the petitioner's brief squarely presents the issue. Smith v. Digmon, 434 U.S. 332 (1978) (per curiam); see also Baldwin v. Reese, 124 S. Ct. 1347, 1350-51 (2004) (a federal habeas claim is fairly presented to a state appellate court only if that claim appears in the petitioner's brief).

When a petitioner's claims have never been actually presented to the state courts but a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted, but procedurally barred. Coleman, 501 U.S. at 752-53; Teague v. Lane, 489 U.S. 288, 297-99 (1989); Wainwright v. Sykes, 433 U.S. at 87-88; Rust, 17 F.3d at 160.

A petitioner confronted with either variety of procedural default must show cause for the default and that he was prejudiced in order to obtain federal court review of his claim. Teague, 489 U.S. at 297-99; Wainwright v. Sykes, 433 U.S. at 87-88. Cause for a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. Coleman, 501 U.S. at 752-53; Murray v. Carrier, 477 U.S. 478, 488 (1986).

A petitioner may avoid the procedural bar, and the necessity of showing cause and prejudice, by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. The petitioner

14

must show that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" Schlup v. Delo, 513 U.S. 298, 327 (1995) (quoting Murray, 477 U.S. at 496). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Id.

The conduct of Murff's postconviction proceedings was governed by the then-current version of Tennessee's Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-201 to -222. That act specified types of procedural default that might bar a state court from reviewing the merits of a constitutional claim. A one-year statute of limitations governed the filing of petitions. Id. at § 40-30-202. The statute also enunciated a standard by which state courts were to determine whether to consider the merits of post-conviction claims:

> Upon receipt of a petition in proper form, or upon receipt of an amended petition, the court shall examine the allegations of fact in the petition. If the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the petition shall be dismissed. The order of dismissal shall set forth the court's conclusions of law.

Id. at § 40-30-206(f).[3]

---

[3]      Tenn. Code Ann. § 40-30-206 continued:

(g)    A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

(continued...)

15

The Sixth Circuit has upheld the dismissal of a Tennessee prisoner's habeas petition as barred by a procedural default caused by failing to file within the Tennessee statute of limitations on postconviction relief. <u>Hannah v. Conley</u>, 49 F.3d 1193, 1194-95 (6th Cir. 1995) (construing first statute and stating "the language of Tenn. Code Ann. § 40-30-102 is mandatory"). In this case, Murff's right to file any further state postconviction petition is barred by the one-year statute of limitations and, therefore, he does not have the option of returning to state court to exhaust any claim presented in this § 2254 petition.

B.   <u>Legal Standard for Merits Review</u>

The standard for reviewing a habeas petitioner's constitutional claims on the merits is enunciated in 28 U.S.C. § 2254(d). That section provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

---

[3]      (...continued)
    (1)   The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

    (2)   The failure to present the ground was the result of state action in violation of the federal or state constitution.

(h)   A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

16

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This Court must determine whether the state court adjudications of the claims that were decided on the merits were either "contrary to" or an "unreasonable application of" "clearly established" federal law as determined by the United States Supreme Court. This Court must also determine whether the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding.

1.    § 2254(d)(1)

The Supreme Court has issued a series of decisions setting forth the standards for applying § 2254(d)(1).[4] In (Terry) Williams v. Taylor, 529 U.S. 362, 404 (2000), the Supreme Court emphasized that the "contrary to" and "unreasonable application of" clauses should be accorded independent meaning. A state-court decision may be found to violate the "contrary to" clause under two circumstances:

A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if

---

[4]    By contrast, there is a dearth of caselaw concerning the standards for applying § 2254(d)(2).

17

the state court confronts a set of facts that are
materially indistinguishable from a decision of this
Court and nevertheless arrives at a result different from
our precedent. Accordingly, in either of these two
scenarios, a federal court will be unconstrained by §
2254(d)(1) because the state-court decision falls within
that provision's "contrary to" clause.

Id. at 405-06 (citations omitted); see also Price v. Vincent, 538

U.S. 634, 640 (2003); Lockyer v. Andrade, 538 U.S. 63, 73 (2003);

Bell v. Cone, 535 U.S. 685, 694 (2002).[5] The Supreme Court has

emphasized the narrow scope of the "contrary to" clause, explaining

that "a run-of-the-mill state-court decision applying the correct

legal rule from our cases to the facts of a prisoner's case would

not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."

Williams, 529 U.S. at 406; see also id. at 407 ("If a federal

habeas court can, under the 'contrary to' clause, issue the writ

whenever it concludes that the state court's application of clearly

established federal law was incorrect, the 'unreasonable

application' test becomes a nullity.").

A federal court may grant the writ under the

"unreasonable application" clause "if the state court correctly

identifies the governing legal principle from [the Supreme Court's]

decisions but unreasonably applies it to the facts of the

particular case." Cone, 535 U.S. at 694; see also Andrade, 538 U.S.

---

[5]       The Supreme Court has emphasized that this standard "does not require
citation of our cases—indeed, it does not even require awareness of our cases,
so long as neither the reasoning nor the result of the state-court decision
contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (emphasis
in original).

at 75; <u>Williams</u>, 529 U.S. at 409.[6] "[A]n unreasonable application of federal law is different from an incorrect application of federal law." <u>Williams</u>, 529 U.S. at 410.[7] "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id.</u> at 409.[8]

Moreover, § 2254(d)(1) refers to "clearly established" federal law, "as determined by the Supreme Court of the United

---

[6]   Although the Supreme Court in <u>Williams</u> recognized, <u>in dicta</u>, the possibility that a state-court decision could be found to violate the "unreasonable application" clause when "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," 529 U.S. at 407, the Supreme Court expressed a concern that "the classification does have some problems of precision," <u>id.</u> at 408. The <u>Williams</u> Court concluded that it was not necessary "to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)," <u>id.</u> at 408-09, and, to date, the Supreme Court has not had occasion to revisit the issue. <u>See</u> <u>Williams v. Coyle</u>, 260 F.3d 684, 699-700 (6th Cir. 2001), <u>cert. denied</u>, 536 U.S. 947 (2002).

[7]   <u>See also</u> <u>Andrade</u>, 538 U.S. at 75 (lower court erred by equating "objectively unreasonable" with "clear error"; "These two standards, however, are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam) (holding that the lower court "did not observe this distinction [between an incorrect and an unreasonable application of federal law], but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d).")); <u>Cone</u>, 535 U.S. at 698-99 ("For [a habeas petitioner] to succeed . . . , he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly."); <u>Williams</u>, 529 U.S. at 411 ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

[8]   <u>See also</u> <u>Brown v. Payton</u>, No. 03-1039, slip op. at 13 (U.S. Mar. 22, 2005) ("Even were we to assume the '"relevant state-court decision applied clearly established federal law erroneously or incorrectly,"' . . . there is no basis for further concluding that the application of our precedents was 'objectively unreasonable.'") (citations omitted).

States." This provision "expressly limits the source of law to cases decided by the United States Supreme Court." <u>Harris v. Stovall</u>, 212 F.3d 940, 944 (6th Cir. 2000). As the Sixth Circuit explained:

> This provision marks a significant change from the previous language by referring only to law determined by the Supreme Court. A district court or court of appeals no longer can look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.

<u>Herbert v. Billy</u>, 160 F.3d 1131, 1135 (6th Cir. 1999) (citing 17A C. Wright, A. Miller & E. Cooper, <u>Federal Practice and Procedure</u> § 4261.1 (2d ed. Supp. 1998)); <u>see also</u> <u>Harris</u>, 212 F.3d at 944 ("It was error for the district court to rely on authority other than that of the Supreme Court of the United States in its analysis under § 2254(d)."). Finally, in determining whether a rule is "clearly established," a habeas court is entitled to rely on "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412.

2.   <u>§ 2254(d)(2)</u>

There is almost no case law about the standards for applying § 2254(d)(2), which permits federal courts to grant writs of habeas corpus where the state court's adjudication of a petitioner's claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

20

presented in the State court proceeding." The few decisions
interpreting this provision have attempted to incorporate the
standards applicable to the "unreasonable application" prong of §
2254(d)(1). Thus, the Sixth Circuit stated, in an unpublished
decision, that

> a federal habeas court may not grant habeas relief under
> § 2254(d)(2) simply because the court disagrees with a
> state trial court's factual determination. Such relief
> may only be granted if the state court's factual
> determination was "objectively unreasonable" in light of
> the evidence presented in the state court proceedings.
> Moreover . . . , the state court's factual determinations
> are entitled to a presumption of correctness, which is
> rebuttable only by clear and convincing evidence.

Young v. Hofbauer, 52 Fed. Appx. 234, 236 (6th Cir. Dec. 2, 2002)
(citing 28 U.S.C. § 2254(e)(1));[9] see also Stanley v. Lazaroff, 01-
4340, 2003 WL 22290187, at *9 (6th Cir. Oct. 3, 2003); Jackson v.
Holland, No. 01-5720, 2003 WL 22000285, at *7 (6th Cir. Aug. 21,
2003) ("Though the Supreme Court has not yet interpreted the
'unreasonable determination' clause of § 2254(d)(2), based upon the
reasoning in Williams, it appears that a court may grant the writ
if the state court's decision is based on an objectively
unreasonable determination of the facts in light of the evidence
presented during the state court proceeding.") (citing Torres v.
Prunty, 223 F.3d 1103, 1107-08 (9th Cir. 2000)).

---

[9]      See also Sumner v. Mata, 449 U.S. 539, 546-47 (1981) (applying
presumption of correctness to factual determinations of state appellate courts).

IV.   ANALYSIS OF PETITIONER'S CLAIMS

   A.   The jury selection issue (Claim 1)

In his first claim for relief, Murff contends that his Sixth Amendment right to a fair and impartial jury was violated. In his legal memorandum, Murff explains that his trial counsel provided ineffective assistance for failing to object to a prospective juror who was employed as a sergeant at the Lauderdale County Jail, where Murff was held prior to trial. According to Murff, the prospective juror had personal animosity toward him due to grievances Murff had filed concerning his failure properly to supervise his employees at the Jail. Murff also asserts that the very presence of the sergeant on the jury violated his Sixth Amendment rights, as the juror's alleged animosity constituted a personal interest in the outcome of the criminal case.

As a preliminary matter, there is no indication that Murff exhausted his claim that the very presence of the sergeant on the jury violated his Sixth Amendment right to an impartial jury. As Murff has not shown either cause or prejudice, or satisfied the standard set forth in Schlup v. Delo, that aspect of the first claim is barred by procedural default.[10]

Murff raised the ineffective assistance aspect of this claim in his postconviction petition, and the Tennessee Court of

--------

[10]   As discussed infra p. 16, trial counsel advised the petitioner that he had no valid claim concerning the sergeant because he had accepted him as a juror even though his peremptory challenges were not exhausted.

22

Criminal Appeals rejected the claim on the merits. <u>Murff v. State</u>, 2004 WL 367668, at *2, *3, *5. Accordingly, the petitioner has exhausted an ineffective assistance claim based on the selection of the sergeant as a juror.

A claim that ineffective assistance of counsel has deprived a habeas petitioner of his Sixth Amendment right to counsel is controlled by the standards enunciated in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 688.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

23

> counsel's perspective at the time. Because of the
> difficulties inherent in making the evaluation, a court
> must indulge a strong presumption that counsel's conduct
> falls within the wide range of reasonable professional
> assistance; that is, the defendant must overcome the
> presumption that, under the circumstances, the challenged
> action "might be considered sound trial strategy."

Id. at 689 (citations omitted); see also Coe v. Bell, 161 F.3d 320,

342 (6th Cir. 1998) ("The specifics of what Coe claims an effective

lawyer would have done for him are too voluminous to detail here.

They also largely miss the point: just as (or more) important as

what the lawyer missed is what he did not miss. That is, we focus

on the adequacy or inadequacy of counsel's actual performance, not

counsel's (hindsight) potential for improvement."); Adams v. Jago,

703 F.2d 978, 981 (6th Cir. 1983) ("a defendant 'has not been

denied effective assistance by erroneous tactical decisions if, at

the time, the decisions would have seemed reasonable to the

competent trial attorney'").

     A prisoner attacking his conviction bears the burden of

establishing that he suffered some prejudice from his attorney's

ineffectiveness. See Lewis v. Alexander, 11 F.3d 1349, 1352 (6th

Cir. 1993); Isabel v. United States, 980 F.2d 60, 64 (1st Cir.

1992). "[A] court need not determine whether counsel's performance

was deficient before examining the prejudice suffered by the

defendant." Strickland, 466 U.S. at 697. If a reviewing court finds

a lack of prejudice, it need not determine whether, in fact,

counsel's performance was deficient. See id. at 697.

The Tennessee Court of Appeals denied this claim on the merits, explaining as follows:

> During jury selection, a sergeant at the jail where the petitioner was confined was seated as a prospective juror. Counsel stated she recommended his dismissal, but the petitioner wanted him retained due to the sergeant's fair treatment of the petitioner. The sergeant was seated as a juror. . . .
>
> . . . .
>
> After the petitioner's conviction, counsel reviewed the appellate issues with him. The petitioner brought up the issue of the sergeant on the jury, and counsel explained it was not an appropriate appellate issue as the petitioner had accepted the juror and the peremptory challenges were not exhausted. . . .
>
> . . . .
>
> In reference to jury selection, the petitioner contended that he had opposed the retention of the sheriff's deputy as a juror. He stated that it would have been illogical for him to accept the sergeant after having filed a grievance on one of the sergeant's subordinate's. . . .
>
> . . . .
>
> In reference to the petitioner's complaint of improper jury selection, the post-conviction court accepted counsel's testimony concerning her recommendation that the juror in question be excused and thus rejected the petitioner's claim. . . . In concluding that the petitioner had not established that services of counsel were deficient or any resultant prejudice, the post-conviction judge found that the petitioner had failed to establish the factual allegations by clear and convincing evidence.
>
> The post-conviction court accepted counsel's testimony concerning . . . the jury selection. The evidence does not preponderate against these findings, and we accept them.

Murff v. State, 2004 WL 367668, at *2, *3, *5.

25

An analysis of Murff's petition is complicated because he has not referred to the legal standards for reviewing habeas claims on the merits. See supra pp. 16-21. Murff makes no argument that the decision of the Tennessee Court of Criminal Appeals on this issue was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). This is "a run-of-the-mill state-court decision applying the correct legal rule from [Strickland v. Washington] to the facts of a prisoner's case" and, therefore, it "does not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams v. Taylor, 529 U.S. at 406.

It is not clear whether Murff contends that the decision of the Tennessee Court of Criminal Appeals was an unreasonable application of Strickland or whether he contends that the decision was incorrect. Williams, 529 U.S. at 410; see also supra p. 19 n.7. Murff does not cite any controlling Supreme Court precedent for the proposition that it constitutes ineffective assistance of counsel, as a matter of law, for an attorney to fail to challenge a juror under the circumstances of this case. See Miller v. Francis, 269 F.3d 609, 620-21 (6th Cir. 2001) (state court's finding that attorney did not render ineffective assistance in case involving gross sexual imposition and rape of a minor by failing to challenge prospective juror who revealed during voir dire that she had some knowledge of case due to her work as a caseworker at state

26

Department of Children's Services was not an unreasonable application of Strickland).

Murff seems to contend that the decision of the Tennessee Court of Criminal Appeals was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing. 28 U.S.C. § 2254(d)(2). However, the petitioner fails to demonstrate that the factual findings of the Tennessee Court of Criminal Appeals were objectively unreasonable. Although Murff asserts that the juror at issue had personal knowledge concerning the facts of the case, he fails to cite any facts that would support that proposition. At most, the juror had information concerning Murff's conduct while he was incarcerated prior to trial. See Miller, 269 F.3d at 616-17 ("Jurors need not be totally ignorant of the facts and issues involved in the case. . . . Furthermore, while [the juror] served as [the victim's mother's] welfare caseworker, there is no indication from the record that they shared a close personal relationship.") (citing Irvin v. Dowd, 366 U.S. 717, 722 (1961)).

Moreover, Murff fails to address the state-court's finding that he has not demonstrated prejudice. See supra p. 25. In order to prevail on an ineffective assistance claim based on counsel's conduct during voir dire, a habeas petitioner must demonstrate that a juror had an actual bias against him. Tinsley v. Million, 399 F.3d 796, 805 (6th Cir. 2005); Miller v. Webb, 385

F.3d 666, 674 (6th Cir. 2004); <u>Miller v. Francis</u>, 269 F.3d at 616.
"Actual bias" means "'bias in fact'—the existence of a state of
mind that leads to an inference that the person will not act with
entire impartiality." <u>Miller v. Webb</u>, 385 U.S. at 673 (internal
quotation marks omitted). Murff's petition does not set forth any
facts from which it can be inferred that the juror at issue was
actually biased against him. Indeed, Murff's admission that he
rejected his attorney's recommendation that the defense exercise a
peremptory challenge to strike that prospective juror because he
believed him to be a fair man undermines his claim that the jailer
was so obviously biased that his attorney rendered ineffective
assistance by failing to challenge him. Accordingly, Murff has not
satisfied his burden of demonstrating, by clear and convincing
evidence, that the state-court's decision that he had failed to
establish deficient performance and prejudice, within the meaning
of <u>Strickland</u>, was based on an unreasonable determination of the
facts in light of the evidence presented at the state-court
hearing.

        For all of the foregoing reasons, Murff's first claim is
without merit and is DISMISSED.

B.     The failure to promptly arraign the petitioner (Claim 2)

In his second claim for relief, Murff asserts that the State violated his Fourth Amendment rights by failing to promptly arraign him. According to Murff, he was handcuffed by police on May 27, 2000 at approximately 8:30 p.m. and taken to the police station, where he remained until very early the next morning. An arrest warrant was not issued until May 30, 2000. His initial appearance was scheduled for June 8, 2000, at which time the General Sessions Court judge directed that a criminal background check be run and continued the case until June 23, 2000. At that time, his motion for a reduction in bail was denied and a preliminary hearing was set for September 1, 2000.

Murff failed to exhaust this issue in state court, having failed to raise it on direct appeal, in his postconviction petition, or in his state habeas application.[11] Because there is no longer any avenue by which Murff can raise this claim in the state courts, the issue is procedurally barred. Accordingly, the Court DISMISSES Murff's second claim.

---

[11]     Trial counsel testified at the postconviction hearing that the three-month delay between the filing of charges and the preliminary hearing "was due to the victim's injuries, which were characterized as life threatening." Murff v. State, 2004 WL 367668, at *2. There is no indication that Murff presented that delay as an independent claim for relief to any state court. In addressing Murff's ineffective assistance claims, the Tennessee Court of Criminal Appeals noted that it "would have been futile" for counsel to file a writ of habeas corpus based on the delay between his arrest and the preliminary hearing. Id. at *5.

C.    Ineffective assistance of counsel (Claims 3, 4 & 5)

In his three final claims, Murff asserts that he received ineffective assistance of counsel. The specific acts and omissions of counsel that are alleged to constitute deficient performance are not clearly enumerated in the petition. It appears, however, that Murff first asserts that his attorney admitted during the postconviction hearing that she did not determine that Murff had the affirmative defense of claim of right until a few days before trial.[12] Because counsel failed to give proper notice of the affirmative defense, the trial judge did not instruct the jury as to the defense.

Although counsel did not explicitly raise the matter as an affirmative defense, that argument did form the basis for Murff's sufficiency of the evidence argument on direct appeal, which the Tennessee Court of Criminal Appeals rejected on the merits:

> A conviction for especially aggravated robbery requires that the State prove (1) an intentional or knowing theft of property from the person of another by violence or putting the person in fear; (2) accomplished with a deadly weapon; and (3) where the victim suffers serious bodily injury. See Tenn. Code Ann. §§ 39-13-401(a), -403(a) (1997). Theft of property occurs when a person, acting with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. See Tenn. Code Ann. § 39-14-103 (1997).

---

[12]    Murff is apparently contending that his attorney should have raised as an affirmative defense to the charge of especially aggravated robbery that the money taken was due and owing for his lawn services.

The defendant apparently concedes that he used a deadly weapon, that the victim sustained serious bodily injury in the attack, and that he took $10 from the victim's wallet. Nonetheless, he contends that the evidence was insufficient to support his conviction for especially aggravated robbery because the State failed to show that he took anything from the victim other than the "ten dollars that both parties agreed was owed for lawn mowing services." Although the defendant's argument on this issue is not entirely clear, we surmise that he is relying on the "owner of property" language in the definition of theft of property to assert that he cannot be convicted of robbery for taking his own property from the victim, i.e., the $10 he claims he was owed.

The defendant is mistaken. As an initial matter, we note that the record contradicts his assertion that "both parties agreed" that the lawn mowing debt was $10. The victim testified he thought the defendant was there to collect $5, the usual amount the victim paid the defendant for cutting his grass. However, the amount of money the victim may have owed the defendant has no bearing on the defendant's conviction for especially aggravated robbery. The manner in which property is taken, rather than to whom it lawfully belongs, is the issue in robbery offenses. See State v. Cannon, 661 S.W.2d 893, 899 (Tenn. Crim. App. 1983); Elliott v. State, 2 Tenn. Crim. App. 418, 454 S.W.2d 187, 188 (Tenn. Crim. App. 1970). "'The gist of the offense of robbery is the felonious and forcible taking from the person of another goods of value by putting him in fear.'" State v. Claybrooks, 910 S.W.2d 868, 871 (Tenn. Crim. App. 1994) (quoting Elliott, 454 S.W.2d at 188). Although our current definition of robbery is slightly different, see Tenn. Code Ann. § 39-13-401(a) (1997), the principle remains the same, see State v. Darrell Wentzel, No. 01C01-9705-CC-00193, 1998 Tenn. Crim. App. LEXIS 1263, at *19 n. 4 (Tenn. Crim. App. Dec. 7, 1998) ("[N]othing in the aggravated robbery statutes requires proof of ownership."), perm. to appeal denied (Tenn. May 10, 1999); State v. Paul Dwight Finchum, No. 02C01-9105-CR-00087, 1991 Tenn. Crim. App. LEXIS 845, at *4 (Tenn. Crim. App. Oct. 16, 1991) ("[A] person who commits the acts necessary to constitute the offense of armed robbery is nonetheless guilty of that offense even though the property taken in the robbery is the property of the robber."); State v. Steven E. Moore, No. 88-240-III, 1989 Tenn. Crim. App. LEXIS 242, at *3 (Tenn.

Crim. App. Mar. 28, 1989) ("The defendant is guilty of armed robbery even if he could show he only took his own money from the victim."). <u>Thus, evidence that the defendant took any amount of cash or property during his violent hammer-wielding attack on the victim would be sufficient to support his conviction for especially aggravated robbery, regardless of how much the victim owed or whether he refused to pay the debt.</u>

<u>State v. Murff</u>, 2002 WL 1284296, at *6-*7 (emphasis added). In light of this discussion by the Tennessee Court of Criminal Appeals, it appears doubtful that a "claim of right" defense to a robbery charge exists under Tennessee law.

The Tennessee Court of Criminal Appeals rejected this aspect of Murff's ineffective assistance claim on the merits:

> Counsel considered affirmative defenses and thought one was applicable, a "claim of right." This defense was based on the petitioner's claim that the victim owed him money for yard work. Counsel failed to file notice of this as an affirmative defense, and it was not included in the jury instructions. However, the petitioner's claimed right to the money was argued to the jury.
>
> . . . .
>
> Counsel conceded that the one affirmative defense she adopted, a "claim of right" as to the money taken, was not timely filed. However, the issue was argued to the jury and was considered on direct appeal. In rejecting this argument, this Court stated, "the amount of money the victim may have owed the [petitioner] has no bearing on the [petitioner's] conviction for especially aggravated robbery." <u>Anthony Murff</u>, 2002 Tenn. Crim. App. LEXIS 498, at *20.

<u>Murff v. State</u>, 2004 WL 367668, at *2, *5.

In light of the decisions of the Tennessee Court of Criminal Appeals with respect to the so-called "claim of right" defense under Tennessee law, Murff cannot establish that his

32

attorney's failure to file a notice of affirmative defense constituted deficient performance or that he suffered prejudice as a result of that omission. This issue is without merit.

Next, Murff asserts that other affirmative defenses were available, including adequate provocation, self defense, and the duty to retreat. It appears that Murff did not raise any issue pertaining to adequate provocation and duty to retreat in state court and, as he no longer has any means of raising these issues, they are procedurally barred. Likewise, it appears that the only reference to self defense that was raised in state court occurred in passing during his testimony at the postconviction hearing. Murff v. State, 2004 WL 367668, at *3. Murff has not set forth facts indicating he had a viable claim of self defense, particularly in light of the number of blows the victim sustained and the severity of his injuries. Moreover, the evidence at trial indicated that the defendant had no visible signs of injury at the time of his arrest. See supra pp. 8, 9. Accordingly, this issue is without merit.

Next, Murff suggests that his attorney should have presented evidence that the victim had a violent attitude and a drug and drinking problem. This issue was raised at the postconviction hearing. Trial counsel testified that "[h]er investigation did not confirm any evidence of violent behavior or tendencies by the victim." Murff v. State, 2004 WL 367668, at *1.

33

During his testimony, Murff "faulted counsel's lack of investigation into the possibility of the victim combining alcohol and Prozac." Id. at *2. He also "complained that counsel did not agree with his desire to attack the victim's mental state. He stated that her investigation into the facts and his defenses were so deficient as to result in an unfair trial." Id. Although the Tennessee Court of Criminal Appeals did not discuss this issue at length, it found that "none of the petitioner's allegations merit relief." Id. at *5.

Murff has not satisfied his burden of demonstrating that this conclusion was contrary to, or an unreasonable application of, clearly established federal law, as required by 28 U.S.C. § 2254(d)(1), or that the decision was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing, as required by 28 U.S.C. § 2254(d)(2). Notably, Murff has come forward with no specific information that the victim had a history of violence or of abuse of alcohol or prescription drugs.[13] Moreover, in light of the age of the victim and the severity of his injuries, counsel appears to have made a reasonable strategic decision that the jury would be unlikely to be receptive to this line of defense. This issue is without merit.

---

[13]    As previously noted, see supra p. 6, one of the investigating officers testified at trial that he had not smelled alcohol on the victim's breath.

34

Murff also argues that counsel failed to confirm the accuracy of the victim's medical records, which were apparently produced in discovery by the prosecution, and failed to investigate the puddle of blood on the floor of the victim's apartment. Although the issue is not clearly articulated in the petition, it seems Murff is reiterating a claim, first raised in connection with the postconviction petition, that the victim's injuries were not as severe as had been represented. The Tennessee Court of Criminal Appeals rejected this claim on the merits:

> The petitioner's counsel testified that she reviewed the victim's medical reports from The Med, Baptist Lauderdale, and a rehabilitation facility. Counsel could not recall the exact number of times the victim had been struck but said there was one depressed skull fracture that required a metal plate insert and several other deep gashes on the head. She recalled the petitioner had claimed that he only struck the victim once.
>
> . . . .
>
> On cross-examination, counsel reiterated that the victim's injuries were serious enough to render his survival questionable. . . .
>
> The petitioner testified that, had counsel investigated properly, she would have seen that the victim was untruthful in his account. He also stated that, had counsel talked to physicians personally, she could have better refuted the prosecution theory on the number of injuries suffered by the victim. . . .
>
> . . . .
>
> . . . The petitioner also stated his belief that, had expert medical testimony been acquired, it would have refuted the allegation that he repeatedly struck the victim.
>
> . . . .

35

In regard to the petitioner's claim that an expert witness should have been retained to testify that the victim was not seriously injured, the post-conviction court pointed out there was no showing an expert would have testified in that manner. We note as well that it is the obligation of the petitioner to present such a witness at the evidentiary hearing. State v. Black, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

Murff v. State, 2004 WL 367668, at *2, *5.

Murff has not satisfied his burden of demonstrating that this conclusion was contrary to, or an unreasonable application of, clearly established federal law, as required by 28 U.S.C. § 2254(d)(1), or that the decision was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing, as required by 28 U.S.C. § 2254(d)(2). Because he failed to introduce expert testimony at his postconviction hearing, there is no proof that the extent of the victim's injuries was open to question or that counsel's failure to raise the issue satisfied either prong of the Strickland standard. This issue is without merit.

Next, Murff contends that his attorney failed adequately to consult with him prior to trial. This issue was raised at the postconviction hearing, and the Tennessee Court of Criminal Appeals rejected it on the merits:

The petitioner refused to meet with counsel on one of her pretrial visits to the jail. Counsel informed the trial court, and a hearing was held the following day. The petitioner requested a new attorney be appointed, and the court denied the request. Following the hearing, counsel stated she was able to spend several hours with

36

the petitioner preparing for trial. She felt prepared for trial. . . .

. . . .

On cross-examination, . . . [c]ounsel could not recall the number of hours spent in consultation with the petitioner but did state that she met with him a total of nine or ten times. . . .

. . . .

The petitioner testified that he tried repeatedly to have counsel come and discuss his defense. He stated that his wife and mother called his counsel and that he sent word by inmates requesting her presence. He also sent a six-page letter to counsel in reference to preparing the defense. After the petitioner sent a letter of complaint to counsel's supervisor, she appeared for a conference three days later. . . .

. . . .

In reference to allegations of non-communication in his petition, he stated there was a conflict between him and counsel. The petitioner said he was frustrated that counsel would not come and talk to him. He stated "[i]t got to the point where, . . . . I refused to see her." The petitioner stated that he did not trust counsel and although they communicated at trial, he did not feel his input was accepted.

. . . .

The post-conviction court accepted the testimony of counsel as to her consultation with the petitioner and rejected the petitioner's claim of inadequate consultation. . . .

. . . .

The post-conviction court accepted counsel's testimony concerning the investigation, consultation with the petitioner, and counsel's account of the jury selection. The evidence does not preponderate against these findings, and we accept them.

<u>Murff v. State</u>, 2004 WL 367668, at *2-*3, *5.

Although Murff appears to take the position that this decision was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing, he fails to come forward with clear and convincing evidence to contradict the state-court's factual findings. Moreover, even if it were accepted that counsel did not meet with Murff as often as he would have liked, he fails to demonstrate a reasonable likelihood that, if only there had been more meetings, counsel would have been able to pursue some viable defense. This issue is without merit.

Murff also contends that the jury was not instructed with respect to the affirmative defense of "claim of right." The petition does not present the jury charge Murff contends should have been given. As previously noted, however, see supra pp. 30-33, no such defense exists under Tennessee law to a robbery charge and, therefore, counsel was not ineffective for failing to request a jury instruction. This issue is without merit.

Finally, although Murff argues that counsel rendered ineffective assistance by failing to investigate and present mitigating evidence at the sentencing hearing, this issue was not raised in state court and, as no avenue for raising the issue presently exists, it is barred by procedural default.

Because it "plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court," summary dismissal prior to

38

service on the respondent is proper. Rule 4, Section 2254 Rules. The petition is DISMISSED.

IV. <u>APPEAL ISSUES</u>

The Court must also determine whether to issue a certificate of appealability ("COA"). The statute provides:

> (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
> > (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
> >
> > (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253©; <u>see also</u> Fed. R. App. P. 22(b); <u>Lyons v. Ohio Adult Parole Auth.</u>, 105 F.3d 1063, 1073 (6th Cir. 1997) (district judges may issue certificates of appealability under the AEDPA). No § 2254 petitioner may appeal without this certificate.

In <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000), the Supreme Court stated that § 2253 is a codification of the standard announced in <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 (1983), which requires a showing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been

resolved in a different manner or that the issues presented were

"'adequate to deserve encouragement to proceed further.'" <u>Slack</u>,

529 U.S. at 484 (quoting <u>Barefoot</u>, 463 U.S. at 893 & n.4).

The Supreme Court recently cautioned against undue

limitations on the issuance of certificates of appealability:

> [O]ur opinion in <u>Slack</u> held that a COA does not require
> a showing that the appeal will succeed. Accordingly, a
> court of appeals should not decline the application of a
> COA merely because it believes the applicant will not
> demonstrate an entitlement to relief. The holding in
> <u>Slack</u> would mean very little if appellate review were
> denied because the prisoner did not convince a judge, or,
> for that matter, three judges, that he or she would
> prevail. It is consistent with § 2253 that a COA will
> issue in some instances where there is no certainty of
> ultimate relief. After all, when a COA is sought, the
> whole premise is that the prisoner "'has already failed
> in that endeavor.'"

<u>Miller-El v. Cockrell</u>, 537 U.S. 322, 337 (2003) (quoting <u>Barefoot</u>,

463 U.S. at 893). Thus,

> A prisoner seeking a COA must prove "'something more
> than the absence of frivolity'" or the existence of mere
> "good faith" on his or her part. . . . We do not require
> petitioners to prove, before the issuance of a COA, that
> some jurists would grant the petition for habeas corpus.
> Indeed, a claim can be debatable even though every jurist
> of reason might agree, after the COA has been granted and
> the case has received full consideration, that petitioner
> will not prevail.

<u>Id.</u> at 338 (quoting <u>Barefoot</u>, 463 U.S. at 893); <u>see also id.</u> at 342

(cautioning courts against conflating their analysis of the merits

with the decision of whether to issue a COA; "The question is the

debatability of the underlying constitutional claim, not the resolution of that debate.").[14]

In this case, there can be no question that any appeal by this petitioner does not deserve attention for the reasons previously stated. The Court, therefore, DENIES a certificate of appealability.

The United States Court of Appeals for the Sixth Circuit has held that the Prison Litigation Reform Act of 1995 ("PLRA"), 28 U.S.C. § 1915(b), does not apply to appeals of orders denying § 2254 petitions. Kincade v. Sparkman, 117 F.3d 949, 951 (6th Cir. 1997); cf. McGore v. Wrigglesworth, 114 F.3d 601 (6th Cir. 1997) (instructing courts regarding proper PLRA procedures in prisoner civil-rights cases). Rather, to seek leave to appeal in forma pauperis in a § 2254 case, and thereby avoid the $255 filing fee required by 28 U.S.C. §§ 1913 and 1917,[15] the petitioner must seek permission from the district court under Rule 24(a) of the Federal Rules of Appellate Procedure. Kincade, 117 F.3d at 952. If the

---

[14]    By the same token, the Supreme Court also emphasized that "[o]ur holding should not be misconstrued as directing that a COA always must issue." Id. at 337. Instead, the COA requirement implements a system of "differential treatment of those appeals deserving of attention from those that plainly do not." Id.

[15]    Effective November 1, 2003, the fee for docketing an appeal is $250. See Judicial Conference Schedule of Fees, ¶ 1, Note following 28 U.S.C. § 1913. Under 28 U.S.C. § 1917, a district court also charges a $5 fee:

> Upon the filing of any separate or joint notice of appeal or application for appeal or upon the receipt of any order allowing, or notice of the allowance of, an appeal or of a writ of certiorari $5 shall be paid to the clerk of the district court, by the appellant or petitioner.

motion is denied, the petitioner may renew the motion in the appellate court.

Rule 24(a) of the Federal Rules of Appellate Procedure states, in pertinent part, that:

> A party to an action in a district court who desires to proceed on appeal in forma pauperis shall file in the district court a motion for leave to so proceed, together with an affidavit, showing, in the detail prescribed by Form 4 of the Appendix of Forms, the party's inability to pay fees and costs or to give security therefor, the party's belief that that party is entitled to redress, and a statement of the issues which that party intends to present on appeal.

The Rule further requires the district court to certify in writing whether the appeal is taken in good faith. For the same reasons the Court denies a certificate of appealability, the Court determines that any appeal in this case would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter by this petitioner is not taken in good faith, and he may not proceed on appeal in forma pauperis.

IT IS SO ORDERED this ____30____ day of August, 2005.

JON PHIPPS McCALLA
UNITED STATES DISTRICT JUDGE

42

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 7 in
case 2:05-CV-02164 was distributed by fax, mail, or direct printing on
August 30, 2005 to the parties listed.

---

Anthony Murff
331233
P.O. Box 1150
Henning, TN 38041--115

Honorable Jon McCalla
US DISTRICT COURT